No. 15,148.

DELLACROCE *v.* INDUSTRIAL COMMISSION.
(138 P. [2d] 280)

Decided May 17, 1943.

Mr. LEON H. SNYDER, Mr. LEONARD v. B. SUTTON, for plaintiff in error.

Mr. GAIL L. IRELAND, Attorney General, Mr. H. LAW-

RENCE HINKLEY, Deputy, Mr. HENRY E. ZARLENGO, Assistant, for defendant in error.

*En Banc.*

MR. JUSTICE KNOUS delivered the opinion of the court.

THIS proceeding arises under the Colorado Employment Security Act, chapter 167A 1941 Cumulative Supplement to '35 C.S.A. (S.L. '36, 3d Ex. Sess. p. 13; S.L. '41, p. 761). About May 12, 1941, claimant was separated involuntarily from his employment as a coal miner with the Golden Cycle Corporation, because of the seasonal reduction in operations ordinarily attaining in the coal mining industry. Following such separation, in due course on claimant's application, unemployment benefits were allowed him and some such were paid. Subsequently, upon the basis of information to the department that during the period of suspension in the mining operations claimant allegedly was actually self-employed as a farmer, a stop order was issued upon the theory that he thereby was rendered ineligible for benefits by section 5(c) of the act, which provides that an unemployed individual shall be disqualified for such benefits when "the department finds that he has failed * * * to return to his customary self-employment (if any) when so directed * * *." By formal hearings and appeals within the department, in the course of which a deputy upheld the stop order, only to be reversed by a referee, the matter reached the commission, which reversed the referee and concluded that when not employed as a miner the claimant was self-employed as a farmer and so ineligible for benefits during periods of involuntary unemployment at the mine.

Considering the statute and the foregoing statement, it is apparent that the sole question for determination was whether, as a matter of fact, claimant historically had been customarily employed as a farmer or had ac-

quired such status following his last separation from his employment as a miner, since, if neither situation attained, he had no employment to which he might "return" and section 5(c) supra, as herein invoked, would impose no disqualification for benefits.

The record discloses that following the time claimant came from Europe to the United States, some thirty-eight years before the hearing, he never has been employed for hire save in the coal mining industry and at all times has been available for such work. He normally has worked in the mines in every quarter of the year and earns from $1400 to $1700 annually. About 1923 claimant and his wife purchased for $650 and jointly took title to 9¾ acres of land of which less than three acres are susceptible of use for farm purposes. This tract of land was within walking distance of the mine where claimant then was employed and since has worked. After such acquisition he and his family have continued to reside in the dwelling house located on the property. There claimant has raised eleven children of his own and of his second wife who came from the "old country" in 1920. Only four children—three boys, aged 18, 16 and 13, and a girl of 15—were living on the place at the time of the hearing, the others having married, with the exception of one boy who went into the army about a year previously. Claimant testified that the place was not purchased as a farm but as a dwelling in connection with which some cows and chickens might be maintained. The family built up a little herd, but in a period of financial depression some 18 years ago the herd, except for one cow and one heifer, was taken by a mortgagee. All the cattle presently on the place—13 cows and 7 calves—are the increase from the original cow and heifer salvaged from the mortgage. In 1930 forty acres east of the family home, upon 22 acres of which forage crops might be raised, were acquired by purchase, apparently in the joint names of claimant and his wife. Later some 400 acres of sparsely grassed

lands were leased from the Pikes Peak Fuel Company for grazing the family livestock, which, in addition to the cattle mentioned, comprised 3 old work horses, 4 colts and a saddle mare. The rental for this land is deducted from claimant's pay as a miner. In addition, claimant's boys, under a verbal agreement with one Viana, the owner, raised on shares some 20 odd acres of stock feed on an adjoining 40 acre tract. To facilitate these operations his boys persuaded claimant to finance the purchase of a tractor for them. No income whatsoever has been derived from the stock raising and farming operations, except some surplus milk, the proceeds of which were received by the wife, and such income has been insufficient for family needs, the deficiency being met regularly from claimant's earnings at the mine. All of the work on the entire property, leased and owned, has been planned and performed by the wife and children, and, except for assisting in repairing a fence on one occasion following a flood several years ago, claimant never has done any manual labor whatsoever in connection with the farm and livestock operations, nor spent any time in the supervision thereof, all of which is left entirely to the mother and children. As the older children grew up the younger continued to operate the property. Ordinarily one full grown boy could do all of the work on the place, so that by dividing the labor, all of the children were able to attend school and some of the boys from time to time worked in private industry.

The foregoing gives a fair synopsis of the evidence introduced which was given by claimant, some of his children and several neighbors familiar with the situation. None of this evidence was contradicted nor were there conflicts therein. It seems certain that this proof established beyond peradventure that the customary employment of claimant was that of a coal miner; that he was able and available for suitable employment as a miner at all times; that he never performed manual

labor on or devoted or spent any time in the supervision of the farm or livestock operations in question, and that such proceeded in the same pattern and routine regardless of whether claimant was or was not working at the mine.

The commission seems to have so viewed the evidence, but to avoid its obvious effect, it recited in its opinion, inter alia: "That the claimant when not employed as a miner was still the owner, lessee and operator of a farm, dairy and considerable farm land and even though it appears, from the testimony that he performed no actual physical labor in cónnection therewith, this Commission is of the opinion that there is error in the testimony for the reason that it believes it is impossible for an individual to own and lease a farm as extensive in its operations as this one appears to be, for a period of over twenty years without engaging in some physical labor in connection with its operations. The Commission further believes that since the ownership is vested in the claimant, it necessarily follows that supervision and control also lie with the claimant; and, therefore, occupies him and requires that he employ time in its operation."

 In our opinion, the record considered, the conclusions reached by the commission are grounded erroneously upon a possible state of facts which do not reasonably appear to exist from the evidence and so are without support. Illustratively, it is correctly recited in the commission's findings and decision that all of the testimony was to the effect that for many years claimant "had performed no actual physical labor" in connection with the questioned farm operations. Nevertheless, the commission, hypothetically and without a scintilla of evidentiary support, as it confesses, expressed that in such period claimant *must* have performed "some physical labor in connection with its operations" and so finally concluded.

Secondly, notwithstanding that positive affirmative evidence to the effect that claimant took no part what-

soever in directing, managing or supervising the farm and operations thereof, was absolutely uncontradicted, the commission conjecturally proceeded to pronounce that because of his partial ownership therein "it necessarily follows" that the farm "occupies him and requires that he employ time in its operation." On its face this recital clearly discloses that the determination that claimant was self-employed as a farmer, was based solely upon the evidence that he owned a fractional interest in a farm property upon which he resided and upon no other proof whatsoever. As defined by section 19 (g) (1) of the act: " 'Employment' subject to the other provisions of this subsection, means any service of whatever nature, * * * performed by an employee for the employing unit employing him." In the sense used, "service" means an active participation in, and not a passive connection with, some given operation, so merely owning or residing on a farm upon, or in connection with, which an individual performs no service whatsoever, ipso facto, does not make him self-employed as a farmer. The words, "customary self-employment" appearing in section 5 (c) of the act, are to be construed as relating to work performed in the field of occupation of an habitual and continuing character, and not to acts of a sporadic and incidental nature.

For these reasons the commission was without right or authority to deny claimant unemployment benefits during the period involved, and the district court likewise was in error in affirming the action of the commission. No decisions of appeallate courts pertaining directly to this question have been cited, but the holdings of the administrative agencies in many states having laws generally similar seem to be in accord with the disposition we make. See, particularly, the following appearing in U.C.I.S., Benefit Series, 6390 Alabama A; 6195 Michigan A; North Dakota, No. A T-325-40, and No. 6483, Oklahoma A. Administrative decisions from Mississippi, Michigan and Indiana, in which self-employ-

ment in farming was declared, are distinguishable and accentuate, rather than impair, the rationale of the principle to which we adhere, in that in 1137 Mississippi and 2979 Michigan R, and 2537 Indiana, the evidence showed that the individual involved *actively* supervised the farming operations and in 1781 Mississippi, the party concerned entered into the farming operations "with the purpose and expectation of making a living and profit therefrom."

The judgment is reversed.

MR. JUSTICE BURKE, MR. JUSTICE JACKSON and MR. JUSTICE GOUDY dissent.